Elbert G. GREEN et al.

v.

UNITED STATES STEEL
CORPORATION et al.

Civ. A. No. 76–3673.

United States District Court,
E. D. Pennsylvania.

Aug. 29, 1979.

Prather G. Randle, Philadelphia, Pa., for plaintiffs.

Henry T. Reath, Philadelphia, Pa., for U. S. Steel.

Julia Penny Clark, Washington, D. C., for Union.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This is an action brought by three individual plaintiffs who allege that the defendants, United States Steel Corporation and the International United Steelworkers of America (AFL–CIO) and International and Local Unions Nos. 4889, 5092, 5030, 5116, 2670, 7246, 507, 510 (hereafter, the union or the union defendants), have engaged in employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. The defendants have moved to dismiss or for summary judgment on all of the plaintiffs' claims. For convenience, the Court will treat each plaintiff's claims separately, although certain issues appear in two or more of the cases.

## DIANE DURANT

United States Steel has moved to dismiss the Title VII claim of Diane Durant. The company argues that Ms. Durant's claim is barred by the statute of limitations because she did not file a complaint with the Equal Employment Opportunities Commission (EEOC) within 180 days of the discriminatory act which forms the basis of her complaint. 42 U.S.C. § 2000e–5(e). For the reasons set forth below United States Steel's motion is denied.

Diane Durant is a black employee of United States Steel who applied for and was rejected for a position as a Physical Tester in the company's Fairless Hills, Pennsylvania, plant. She alleges that she was discriminated against on the basis of race when she was denied the promotion she was seeking.

Ms. Durant received notice that she was rejected for the Physical Tester position on or before April 4, 1974. She filed her complaint with the EEOC on January 6, 1976, some twenty-one months later.

At the time Ms. Durant was rejected for the Physical Tester position the case of *Dickerson v. United States Steel et al.*, 472 F.Supp. 1304 (E.D.Pa.1978), was pending in this Court. *Dickerson* was filed as a class action on behalf of all black employees at the Fairless Hills plant. The complaint alleged generally that United States Steel engaged in a pattern and practice of discrimination in many areas of personnel management and relations, including hiring, firing, assignments and promotions.

On September 16, 1974, the Court certified a class in that case consisting of:

"all blacks now employed or who might be employed in the future by United States Steel Corporation at its Fairless Hills, Pennsylvania, plant; all blacks who were employed by the company from July 2, 1965 to the present date, but who are no longer employed there; and all blacks who unsuccessfully sought employment at the Fairless Hills plant at any time between July 2, 1965 and the present date . . . ."

64 F.R.D. at 353 (E.D.Pa.1974).

Nearly two years later, on August 21, 1976, the Court decertified a part of that broad class on the grounds that the claims of management employees, Clerical and Technical employees, and rejected applicants for employment were not sufficiently related to the claims of Production and Maintenance workers to support the inclusion of all of the groups in a single class. The claims of Production and Maintenance workers proceeded to trial in 1976 and 1977.

As à rule, the filing of a class action complaint tolls the statute of limitations on the filing of individual claims for all purported members of the class. If the class is later decertified, the statute begins to run again and the individual class members must either file new law suits or timely requests to intervene in the original suit, or be barred by the statute. *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Haas v. Pittsburgh National Bank*, 526 F.2d 1083 (3d Cir. 1975).

United States Steel argues that Title VII cases—at least those involving "pattern and practice" complaints—are not governed by the *American Pipe* rule. To prevail on such an argument the company must meaningfully distinguish that case.

*American Pipe* was an antitrust decision. There, the State of Utah filed a class action suit against a number of sellers of concrete and steel pipe on behalf of "public bodies and agencies of the state and local government in the State of Utah who are end users of pipe acquired from the defendants." After the expiration of the original time limit for filing a complaint the district court decertified the class for failure to satisfy the numerosity requirement of Rule 23(a)(1), F.R.Civ.P.

The principal basis for the Supreme Court's holding in *American Pipe* was that a refusal to toll the statute of limitations for individual claims in a class action would induce many of the class members to seek to intervene in the class suit as individual plaintiffs before the end of the limitations period, for fear that their claims would be barred if the class were later decertified for any reason. If such intervention were sought routinely, utility of a Rule 23 class action would be destroyed.[1]

---

1. Although a Title VII claimant must file a complaint with the EEOC before he files or intervenes in a court action, a Title VII class action would present the same problem of disruptive intervention. No matter how many complaints are resolved at the administrative level, a number of complaints are not resolved by the EEOC mediation process. Certainly the

*American Pipe*, however, is distinguishable in certain respects, and the defendant has set forth in its brief a cogent reason not to extend the *American Pipe* holding to a Title VII case:

"In assessing whether *American Pipe* has any application to the circumstances of the present case, one must remember that what was involved in *American Pipe* was a single price-fixing conspiracy. Obviously, in the case of a single conspiracy, the problems referred to in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 [95 S.Ct. 1716, 44 L.Ed.2d 295] (1975) of 'loss of evidence, the disappearance and fading memories of witnesses, and the unfair surprise that could result from a sudden revival of a claim that long has been allowed to slumber' did not exist. The witnesses, the claims, and the evidence would all be the same in the class action as in the individual actions which were brought subsequent to denial of class certification.

To suggest that United States Steel was in any way put on notice that it should begin collecting evidence or witnesses and prepare to defend a claim involving a bid in 1974 for the physical tester position by a member of the clerical and technical local union by the filing of a charge by Moses Dickerson alleging that he had been misled in the Birmingham recruiting process and had been denied the chance to be a welder in 1969 is patently ridiculous."

Defendant United States Steel's Reply Brief at 21–2.

The difficulty with the defendant's argument is that the problems mentioned can arise in a Title VII class action where the statute of limitations is not in issue. Under present law, it is possible for an employer to be faced at trial with claims arising out of events from years past that it may have had no idea occurred.

■ It is well settled that a plaintiff may bring a class action on behalf of those who have not filed a complaint with the EEOC. *Bowe v. Colgate Palmolive Co.*, 416 F.2d 74 (7th Cir. 1969); *Miller v. International Paper Company*, 408 F.2d 283 (5th Cir. 1969); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968); *Sprogis v. United Air Lines*, 444 F.2d 1194 (7th Cir. 1971); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975).

■ In certain circumstances, a Title VII defendant can be required to litigate the *individual* claims of discrimination of individual class members who have not filed EEOC charges. That obligation would arise in a case in which individual damage claims were tried after a finding of liability to the class. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974); *United States v. Wood Wire & Metal Lathers International Union Local Union No. 46*, 328 F.Supp. 429 (S.D.N.Y.1971).

*Johnson v. Goodyear Tire & Rubber Co.*, *supra*, is particularly illustrative. There, the plaintiffs brought a broad-based class action somewhat similar to the *Dickerson* case. The Fifth Circuit upheld the trial court's finding of liability to the class, but reversed the trial court for its failure to award class-wide back pay. The court instructed the trial court to consider on remand a procedure whereby individual class members could present their discrimination claims individually. The putative class member would be required to establish his membership in the class. At that point the court recommended shifting the burden of proof to the employer:

"If an employee can show that he was hired into the labor department before April 22, 1971, and was subsequently frozen into that department because of the discriminatory employment practices established here . . . [it] will be incumbent upon Goodyear to show by convincing evidence that other factors would

post-EEOC action employees would have the same incentive to intervene in a Title VII class which might at some point be decertified as would the class members considered in *American Pipe*.

have prevented his transfer regardless of the discriminatory employment practices. If Goodyear wishes to show that a labor department employee would not be qualified for any other job then its proof must be clear and convincing. . . .

. . . . .

We are not unmindful that in many instances [an individual's] proving entitlement to back pay will be based on probabilities."

*Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d at 1379–80.

If this Court had not decertified Clerical and Technical employees, and the broader class had established United States Steel's liability; and further, if this Court had decided to employ the *Johnson* procedure in the damages portion of the case; Diane Durant would have been permitted to bring her claim of discriminatory refusal of promotion in that stage of the case. She would not have been required to have filed an EEOC complaint, and United States Steel would be searching for witnesses to testify that "other factors . . . prevented" her promotion. *Johnson, supra,* 491 F.2d at 1380. In other words, United States Steel would be required (or at least well-advised) to try to obtain the evidence that it now argues would be an unfair burden to produce. Furthermore, it would be doing so without the benefit of an EEOC complaint to focus its attention on those facts likely to be at issue. In this case, the defendant had the benefit of an EEOC complaint long before trial. It is, in short, better off with respect to Ms. Durant's claim than it might have been if her part of the class in *Dickerson* had not been decertified and had later prevailed.

 It would be arbitrary and unreasonable to penalize a non-filing class member who happens to be in a class that is decertified while rewarding another non-filing class member who happens to fall within a class that survives intact through trial, at least in a case such as *Dickerson* where decertification was ordered only because of the unmanageability of the broader class. The Court agrees that permitting tolling during the pendency of a class action may work a hardship on large corporate defendants who are faced with a task of collecting stale evidence. Nevertheless, that problem was accepted by the federal courts when Title VII classes were first permitted to include those who have not filed EEOC complaints. Given that policy, Title VII cases cannot be removed from the *American Pipe* rule, and *American Pipe* must be held to control.

It is important to emphasize at this point that the Court is not addressing the issue of "tacking". Diane Durant can rely on her membership in the *Dickerson* class to toll the statute of limitations on her EEOC filing. A far different issue might be presented if a plaintiff were attempting to rely on a chain of broadly drawn class complaints. A very large employer might have any number of such complaints pending over a number of years. Thus, the Court expresses no view as to whether Ms. Durant could later have relied on a different broad-based class action filed more than 180 days after the alleged discriminatory act to toll her own filing obligation. Cf. *Wetzel v. Liberty Mutual Insurance Company, supra,* 508 F.2d at 246. If she could not have, many of the objections raised by the defendant would lose much of their force.

Other cases may present slightly different Title VII tolling issues. It is sufficient to say that Diane Durant's EEOC complaint in this case was timely filed, and will support her individual claim.

United States Steel argues for summary judgment on Ms. Durant's § 1981 claim on the grounds that it is undisputed that she was accorded the unfettered right to pursue her claim of race discrimination through the grievance and arbitration provisions of the collective bargaining agreement, just as any white worker would have been permitted to do. In other words, she was accorded the "same right . . . to make and enforce contracts . . . As is enjoyed by white citizens." 42 U.S.C. § 1981.

The company concedes that an employee has a right to bring suit to enforce statuto-

ry rights granted by Title VII, notwithstanding a previous decision on the same claim by an arbitrator. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The company would distinguish review under the Title VII from review under § 1981 on the grounds that § 1981 offers "protection for his or her contractual rights only" (Defendant's Memorandum at 24), and not the sort of independent statutory rights accorded by Title VII. Since it is essentially undisputed that Ms. Durant was accorded full access to the grievance-arbitration process, it is argued that there is no factual issue as to whether her right to enforce a collective bargaining agreement was abridged.

The company's argument is plausible, but it is unsupported either by case law or the policies underlying § 1981.

"[I]t is well settled . . . that § 1981 affords a federal remedy against discrimination in private employment on the basis of race."

*Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). See also, *Young v. International Telephone and Telegraph Co.*, 438 F.2d 757 (3d Cir. 1971).

The flaw in the company's argument is that Ms. Durant is not contesting the fact that the company permitted her the same access to the arbitration process as is enjoyed by whites, nor that the arbitrator decided that she was not discriminated against—she is complaining that the company discriminated against her for a promotion opportunity because of her race, and further, that the arbitrator was wrong in deciding otherwise.

She invokes the terms of § 1981 to attack United States Steel's alleged refusal to "make" a contract with her having the same terms and conditions as the employment contracts it entered into with white employees. Her contract, in other words, allegedly did not include the right to consideration for promotion free from racial discrimination. That issue is entirely separate from whether she was accorded the right to enforce the collective bargaining agreement

through arbitration, a right which the company seeks to establish as the limit of her contractual rights.

The arbitrator did decide that Ms. Durant was not discriminated against on the basis of race. Where, as here, the arbitrator gave the grievant's race discrimination claims full consideration, that determination is entitled to "great weight". *Alexander v. Gardner-Denver Co., supra*, 415 U.S. at 60, n. 21, 94 S.Ct. 1011. However, the district court cannot relinquish to an arbitrator the decision as to whether the rights guaranteed to the plaintiff by a federal statute have been violated. The arbitrator's jurisdiction to interpret the collective bargaining agreement does not extend to jurisdiction over statutory claims. *Id.*, 415 U.S. at 52–4, 94 S.Ct. 1011. To the extent that the rights afforded by the statute and the collective bargaining agreement are similar, the arbitration decision is entitled to commensurately greater weight.

The company also argues that to permit Ms. Durant to arbitrate her discrimination claims and then to sue upon them would be to accord her *greater* contractual rights than are enjoyed by white employees. The argument is simply wrong. White employees are entitled to have their claims of racial discrimination submitted to the grievance-arbitration process, and they are thereafter entitled to sue under § 1981. See *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

Section 1981 is a broad statutory proscription of employment discrimination. It is as true under § 1981 as under Title VII that the plaintiff "is not seeking review of the arbitrator's decision. Rather [she] is asserting a statutory right independent of the arbitration process." *Alexander v. Gardner-Denver Co., supra*, 415 U.S. at 54, 94 S.Ct. at 1022. Ms. Durant must be accorded a full opportunity to pursue the rights granted her by § 1981.

The company has moved for summary judgment on the merits of Ms. Durant's claim, arguing that there are no material

issues of fact and that it is entitled to judgment as a matter of law.

The record shows that as part of the arbitration process, Ms. Durant was given a test to determine whether she was capable of performing the Physical Tester job. The arbitrator found that she was not physically capable of doing the job. The arbitrator's only comment about whether the test was related to the demands of the job was that "the test covered four regular items of the Physical Tester's work . . .". Arbitration Award, p. 2. The Arbitration Award was authenticated by Ms. Durant at her deposition, and is properly part of the record.

Ms. Durant testified that she did not know what the Physical Tester job involved, but that she felt that she passed the test.

Ms. Durant's admission that she does not know precisely what the Physical Tester's job involves is not fatal to her claim. She testified that she felt that she passed the test, and that testimony is sufficient to create an issue of fact as to whether she was qualified for the position. In resisting a motion for summary judgment she is entitled to have her deposition testimony credited entirely, and she is entitled to every reasonable inference that can be drawn from her testimony. It is reasonable to infer that although Ms. Durant does not know all the duties involved in the job, she was certain that she performed the tasks assigned to her during the test without error. For example, the Court is required to infer that she in fact made a clear impression with the metal stamp, even though the arbitrator was of the opinion that she did not.[2]

Of course, the issue of whether Ms. Durant was qualified for the promotion is not dispositive of the case. In fact, the Court and the parties may be faced at trial with a very difficult issue of whether Ms. Durant could have suffered legal harm if (a) she was clearly unqualified for the job, but (b)

one of the company's reasons for refusing to promote her was her race. Compare *Patmon v. Van Dorn Co.*, 498 F.2d 544 (6th Cir. 1974) with *Marquez v. Omaha District Sales Office, Ford Division*, 440 F.2d 1157 (8th Cir. 1971).

In any event, there is certainly an issue of fact on the discrimination question. The plaintiff has introduced evidence, which, if believed, raises the possibility that blacks are seriously under-represented in the Clerical and Technical division. Of course "proof of [a] pattern or practice [of discrimination] supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy". *Teamsters v. United States*, 431 U.S. 324, 362, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977). *A fortiori*, evidence of a pattern or practice at least raises an inference of discrimination sufficient in most cases, and in this case, to preclude summary judgment on an individual claim, either under Title VII or under § 1981.

The union defendants have moved to dismiss Ms. Durant's Title VII complaint on the grounds that Ms. Durant did not name the union in her EEOC complaint. The union's motion will be granted.

Resolution of this motion is governed by *Glus v. G. C. Murphy Co.*, 562 F.2d 880 (3d Cir. 1977). The plaintiff in *Glus* named the company and her local union in her EEOC sex discrimination complaint but failed to name the International union that was involved. The International had helped to negotiate the discriminatory contracts at issue and was held liable by the district court for contribution to the company. The Court of Appeals remanded the case to the district court on the issue of the International's liability, with instructions to make findings of fact about the circumstances surrounding the plaintiff's EEOC filing. The Court listed four factors which should be considered by the district court in deter-

---

**2.** Other parts of the test included operation of the tensile testing machine in which two-foot plugs of pipe were inserted by the operator; the discarding of 30 to 40 pound steel billets; and one other job not specified by the arbitrator.

mining whether it has jurisdiction over a party not named in the EEOC complaint:

(1) Whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint.

(2) Whether, under the circumstances, the interests of a named party are so similar to the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings.

(3) Whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party.

(4) Whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Glus v. G. C. Murphy Co., supra,* 562 F.2d at 888.

Although the *Glus* criteria may not be applicable in every Title VII case, they are appropriate here. The Court will discuss them in turn.

It is obvious that the role of the unnamed party (here, the union) could through reasonable effort by Ms. Durant have been ascertained at the time of filing of her EEOC complaint.

Ms. Durant stated in that complaint that "I filed a grievance and the union took the case to arbitration . ... . this decision went against me. Despite the arbitration award I feel that the company has discriminatorily denied me promotion."

The company was named in the complaint; the space labeled "Others who have discriminated against you (if any)" was left blank.

It is clear from the record before the Court that Ms. Durant knew what role her union played in the grievance process. She testified at her deposition as follows:

"Q. Did the company approach you and ask you to take [the test]?

A. No. He had talked with the company. The union had talked with the company.

Q. Mr. Waltman.

A. They agreed upon it. That's why I felt it was all right.

Q. When you say they had agreed upon it, what is the basis for your saying that?

A. Well, I was using my union representative or my grievance man as a go between because I didn't talk to the company, per se, myself."

Later, referring to the union's role in arbitration she testified:

"Q. You remember that the union argued [at arbitration]—

A. Testing. I agree with this. '. . . testing in itself was a sign of discriminatory treatment, the union said.' Now, I'll go along with that."

The union apparently changed its mind about the utility of the test after it was administered. However, the union attitude about the grievance is not at issue under the *Glus* test. The important fact is that Ms. Durant had a very clear idea of her union's role in the allegedly discriminatory grievance process.[3]

 The Court rejects the plaintiff's argument that the EEOC should have known to investigate the union's conduct to determine whether it participated in the alleged discriminatory act. Cf. *Hicks v. ABT Associates, Inc.,* 572 F.2d 960, 966 (3d Cir. 1978). The facts stated in Ms. Durant's complaint would *discourage* rather than encourage such an investigation. All that the EEOC knew about the union's conduct was that it had pursued Ms. Durant's claim to arbitration—certainly not a fact which

---

**3.** Ms. Durant has moved to amend her complaint to allege a conspiracy between the union and the company to violate her civil rights. 42 U.S.C. § 1985(3).

She argues that the amendment is necessary because she had not before been aware that the union agreed—that is "conspired"—with the company to have her tested. Her testimony at deposition refutes the argument that she recently learned of the union's agreement.

would suggest discrimination on the union's part. To adopt the plaintiff's argument in this case would be to hold that the EEOC is required to investigate union conduct whenever a complaint is filed by an aggrieved union-member employee. In any event, it need not be decided whether such an investigation might be required in another case—one was not required here.[4]

In Ms. Durant's case it is also clear that the interests of the named party, the company, are not so similar to the unnamed party's, the union, that for the purpose of obtaining voluntary conciliation and compliance it was unnecessary to include the union in the EEOC proceedings. Here, the union's interests and the company's interests were nearly opposite. Before the filing of the EEOC complaint the union had filed a grievance alleging race and sex discrimination on the part of the company in the company's handling of Ms. Durant's bid for promotion, and the union carried the argument all the way to arbitration. The union had every reason to hope that Ms. Durant's claim against the company would succeed.

Furthermore, conciliation and compliance on the part of United States Steel would hardly have amounted to conciliation and compliance on the part of the union. The company had every incentive to cast the blame for discrimination (if it could) on the union. In terms of the *Glus* test, *supra*, it is obvious that if the union were guilty of discrimination, an agreement by the company not to discriminate would not make compliance by the union "unnecessary".

The third factor to be considered under *Glus* is whether the unnamed party's absence from the EEOC proceedings resulted in prejudice to its interests.

It is not disputed that the union presented a number of grievances on Ms. Durant's behalf and that the grievance that led to this suit was carried through to arbitration. This case is a particularly good example of an instance where an opportunity to concili-

ate might have proven extremely valuable to the union. Ms. Durant makes very clear in her deposition that her objection to her union's conduct was that she should have received her tester's position right away, without having to proceed through the grievance process.

Had the union been given the opportunity, it might have been able to persuade Ms. Durant that the only way it was able to protect her interests was by means of a grievance. As it is, the union must now expend considerable sums in defending a claim it was not afforded an opportunity to conciliate. Since the union never received such an opportunity it suffered identifiable prejudice.

The final consideration is whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party. Obviously, no union ever even implies to its members that they should deal with it through the company.

Except for narrow exceptions, such as that recognized in *Glus*, we think that Congress should be taken to have meant what it said:

> "[W]ithin ninety days after the giving of such [right to sue] notice a civil action may be brought *against the respondent named in the [EEOC] charge.*" 42 U.S.C. § 2000e–5(f)(1) (emphasis supplied)

Otherwise, wholly independent parties will be put to the expense of defending a court action without ever having been accorded the opportunity to conciliate differences as contemplated by the statute.

The distinction between the International and the Local unions in *Glus* had been blurred somewhat by the bargaining history in that case. Furthermore, the two union entities might have been expected to have been in communication about the suit. To hold in *this* case that the union need not have been named would be tantamount to holding that the union never need be

---

4. It is questionable whether the "reasonable investigation" rule adopted in *Hicks, supra*, extends to a case involving failure to name a party. *Hicks* required reasonable investigation

of the subject matter of the complaint. *Glus, supra*, offered its own test to determine the jurisdiction of the court over unnamed parties.

named. We do not think that is what Congress intended when it enacted the language quoted above.

The union defendants have also moved for summary judgment on the claims made by Ms. Durant under 42 U.S.C. § 1981. Ms. Durant alleges that the union discriminated against her in the handling of grievances arising out of different bids for promotion. The union's motion will be granted in full.

As an element of proof in a § 1981 action this Court has required proof of discriminatory intent or motive. *Croker v. Boeing Vertol Co.*, 437 F.Supp. 1138 (E.D.Pa.1977). Thus, to resist a motion for summary judgment, the plaintiff must point to record facts which show the existence of such intent, or from which such intent can be inferred. She may not rest on the allegations of her pleadings alone. It is therefore necessary to examine the record to determine if there is any evidence of discriminatory intent.

Ms. Durant argues that the union intentionally discriminated against her when it "complied" with the company in administering the physical test as a pre-condition to her promotion to the JC 5 Physical Tester position. The Court has painstakingly reviewed the record and can find no evidence which compels or even permits an inference of the requisite intent.

The union *did* acquiesce in the company's original decision to test the plaintiff:

"Q. So, Mr. Waltman [the union representative] came back to you and as far as you remember, what was it he said to you?

A. 'They want to test you. I feel it is all right.' "

Durant deposition P. 65.

After the test, however, the union argued through the grievance process and at arbitration that the test was racially discriminatory: "[A]ccording to the union, the Grievant was bypassed originally because she was discriminated against by the Company as a woman and as a black." Arbitration Award, p. 2.

The record shows that the only way that the union could arguably have discriminated against Ms. Durant with respect to the physical test was in "complying" with the original test. Indeed, that is the basis upon which the plaintiff's argument rests. (Plaintiff's Memorandum at 9).

The difficulty with the plaintiff's argument is that there is no reason to infer discriminatory intent on the union's part even if the test were patently racially discriminatory.

It is necessary to look at the problem from the union's point of view immediately before the test. It was the union's responsibility to encourage Ms. Durant to take the test in the first instance. If she had passed, she would probably have been offered the job. Had she not passed, the union would not have waived its argument that the test was discriminatory merely by having acquiesced in her taking it. That the union was able to argue during the arbitration hearing that Ms. Durant had been discriminated against demonstrates the truth of that statement. Ms. Durant had everything to gain by taking the test and possibly much to lose by not taking it. See *Patmon v. Van Dorn Co.*, 498 F.2d 544, 547 (6th Cir. 1974).

Although it is true that where intent is in issue, summary judgment is not often appropriate, it is *not* true that invocation of the word dispels any possibility of summary judgment. *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975). The plaintiff is still obliged to point to some evidence which justifies even an inference that her union intentionally and invidiously treated her differently because of her race in its handling of her Physical Tester grievance. She has failed to do so, and her § 1981 claim arising out of that grievance fails.

The only other union conduct which might fall within Ms. Durant's general allegations of discrimination by the union in the handling of her grievances is its role in the April, 1973, grievance that she filed because her bid for transfer to Production Planning was denied. As was true with the Physical Tester grievance, there is nothing

on the record which permits even an inference of discrimination on the part of the union.

The company denied Ms. Durant's bid for transfer to Production Planning on the grounds that her absentee rate was too high. Although Ms. Durant's deposition testimony is not clear, the Court would be able to infer from it that she knows of white employees with absentee records worse than hers who received promotions to jobs similar to that which she was seeking. In other words, her grievance may have been meritorious.

The issue, however, is not whether her grievance was meritorious but whether the union acted discriminatorily in deciding not to pursue it:

> "[A] union does not breach its duty of fair representation . . . merely because it settled the grievance short of arbitration. . . . [If] a union's decision that a particular grievance lacks sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced."

*Vaca v. Sipes*, 386 U.S. 171, 192–193, 87 S.Ct. 903, 918, 17 L.Ed.2d 842 (1967).

Ms. Durant has not pointed to, and the Court has not found, any evidence of discriminatory motive on the union's part. Ms. Durant, in fact, specifically denied having any knowledge of any such motive. (Durant deposition at 90).

What is apparent in the record is that the union has pursued two grievances to arbitration on Ms. Durant's behalf, and achieved a successful result in one. The other was the Physical Tester grievance. The April, 1973, grievance was not carried to arbitration but was carried to the third step of the grievance procedure.

Although the Court does not believe that the union was required to do so,[5] the union has submitted an exhaustive affidavit by George Sirolli, the International Union representative for the fourth step of the grievance procedure. Mr. Sirolli avers that Ms. Durant's grievance was not pursued because it was in his opinion meritless, and because he was concerned that the Board of Arbitration was about to begin to uphold certain drastic company actions planned as a response to absenteeism. Mr. Sirolli did not want such adverse precedents created, and he withdrew Ms. Durant's grievance, as well as some others, from fourth step review for that reason. He avers that race played no part in his decision, and that he withdrew similar grievances filed by whites at the same time. Mr. Sirolli's affidavit stands wholly unrebutted.

The Court notes that Ms. Durant is not limited in the type of evidence she might have introduced on the subject of union conduct. For example, plaintiff Arthur Johnson testified about his union's listless, perfunctory behavior in support of his grievance against the company. (See *infra*) The record in Ms. Durant's case is devoid of any such evidence.

It is difficult to elaborate further on what the record evidence shows. Ms. Durant has, in effect, merely alleged union discrimination without adducing any evidence to support her claims. The union defendants are entitled to summary judgment on her § 1981 claim. *Chatman v. U. S. Steel Corp.*, 425 F.Supp. 753 (N.D.Cal. 1977); *Dawkins v. Nabisco, Inc.*, 15 F.E.P. Cases 609 (N.D.Ga.1977).

### ARTHUR JOHNSON

Plaintiff Arthur Johnson asserts two claims of race discrimination. Mr. Johnson's first claim arises out of the company's refusal to permit him to serve as a "vicing" foreman as similarly situated whites were permitted to do (hereafter the "manage-

---

5. There is no assumption in the law that a decision not to pursue a grievance through all possible steps in itself justifies a reasonable inference that the decision was based on race discrimination. Rather, the plaintiff *always* bears the burden under Rule 56 of pointing to some evidence of discrimination.

ment" claim); the second arises out of the company's refusal to permit Mr. Johnson to demote from his position as a Reconditioning Bar Grinder to a job in a different line of progression (hereafter, the "demotion" claim).

Mr. Johnson was hired at the Fairless Hills plant in 1955.[6] He transferred to the Bar Mill Warehouse a few months later, and moved up through various positions in that facility until September, 1972.

In September of 1972, Mr. Johnson was promoted to the position of Material Handling Foreman of the Electric Furnace and Caster facility. At the time he was promoted Mr. Johnson asked the General Superintendent of the division, Mr. Torlay, if he could be allowed to begin in management as a vicing foreman.

A vicing foreman is a union member who is nevertheless at the first functional level of management. He or she is paid a premium of 10% over the usual eight hour wage, and at all times a vicing foreman continues to accrue union seniority. The job is considered a temporary management position, and although there is some dispute on the issue, it is argued that the company uses the position as a stepping-stone to management.

Mr. Johnson's request to "vice" was denied, and he was promoted directly to management. Within five months two white employees—Larry Bareiszis and, in February, 1973, Bob Smith—were promoted to the position of vicing foreman in Mr. Johnson's area.

Mr. Johnson calculated that his pay as a foreman was only three dollars more per year than that of a vicing foreman, and that a foreman's per hour pay was much worse: a vicing foreman works a 40 hour week (plus occasional overtime), whereas a foreman is required to work 10 to 12 hour days, six days a week. Mr. Johnson testified that vicing foreman is therefore a more desirable position than foreman and that Mr. Bareiszis and Mr. Smith were given discriminatory preference for the vicing jobs.

In March of 1973, Mr. Johnson asked for and was granted permission to leave management to return to Production and Maintenance, and at that point he regained his union status. His tenure in management cost him 182 days in union seniority.

Mr. Johnson filed a complaint with the EEOC on his management claim in July of 1974. The final discriminatory act relating to his request to "vice"—the hiring of Bob Smith as vicing foreman—occurred in February, 1973. *Dickerson* was filed in June, 1973, and Mr. Johnson was a member of the broad class in *Dickerson* until his part of that class was decertified in August of 1976.

Mr. Johnson's "demotion" claim arose approximately four months *after* the filing of his EEOC complaint on the management claim. On January 15, 1975 he asked to demote from his position as a Reconditioning Bar Grinder (in the Bar Mill line of progression), to Feeder Piler, a job which leads to Set-Up Stocker. Had Mr. Johnson been permitted to demote to Feeder Piler his seniority very possibly would have qualified him for Set-Up Stocker immediately.

His request to demote was denied, notwithstanding that at least three whites similarly situated but with less seniority— George Thrappas, Jim Abbot and one "Conway"—had been permitted to demote upon

---

6. The facts recited herein (as construed in the light most favorable to the plaintiff) are taken from Mr. Johnson's trial testimony in the case of *Dickerson v. United States Steel*, 472 F.Supp. 1304 (E.D.Pa.1978). It does not appear that any party has officially moved for Mr. Johnson's *Dickerson* testimony to be incorporated into the record in his case, and the Court does not recall any such incorporation having been ordered. (See, Order of October 20, 1977.) It is apparent however that all parties have assumed that Mr. Johnson's *Dickerson* testimony is a part of the record here as if it were deposition testimony. (See, e. g., United States Steel memorandum at 2; plaintiffs' memorandum at 55–6). The Court is not able to ignore sworn testimony presented to it in an earlier proceeding insofar as that testimony may operate to raise material issues of fact. To clarify the record, the Court orders Mr. Johnson's *Dickerson* testimony incorporated into the record in the same manner as earlier *Dickerson* evidence has been incorporated.

request. Moreover, all of the Set-Up Stockers (the job Mr. Johnson sought) were white.

On January 17, 1975, Mr. Johnson initiated the grievance process. He alleged (in part) discrimination on account of race. His grievance was carried through arbitration where it was denied.

Mr. Johnson complains of his union's handling of the grievance. At no point in the grievance procedure did the union call witnesses on his behalf, and the cross-examination of adverse witnesses by his union representative at the arbitration hearing was perfunctory and unenthusiastic. Mr. Johnson has not filed a complaint with the EEOC or any similar state agency with respect to his demotion claim.

United States Steel has moved to dismiss and for summary judgment on Mr. Johnson's Title VII management claim.[7] The motion to dismiss raises the same issue as does Ms. Durant's claim, *supra*; that is, whether Mr. Johnson's membership in the *Dickerson* class prior to decertification tolled the statute of limitations for the filing of an EEOC complaint. It is undisputed that Mr. Johnson filed his EEOC complaint more than 180 days after the alleged discriminatory act (July 8, 1974, filing; February, 1973 act); but at no time did 180 "untolled" days elapse between the act and the filing.[8]

■ The company's motion to dismiss the claim is denied for the reasons set forth in the Court's discussion of Ms. Durant's Title VII claim against the company, *supra*.

■ The company's motion for summary judgment on the § 1981 management claim is denied, because there is an obvious issue of fact as to whether Mr. Johnson was invidiously denied a privilege that the company accorded to similarly situated whites, i. e., the privilege to act as vicing foreman.

■ The company's motion to dismiss the plaintiff's Title VII demotion claim is

granted. The plaintiff has never filed an EEOC complaint on that claim, and in fact, the events in issue occurred after the filing of his original EEOC charge on his management claim. Neither *Glus v. G. C. Murphy Co.*, *supra*, nor *Hicks v. ABT Associates, Inc.*, *supra*, can be read broadly enough to cure the jurisdictional defect.

■ The company's motion for summary judgment on the § 1981 demotion claim is denied. The decision of the arbitrator on October 25, 1976, found no discrimination on the part of the company in its decision not to permit Mr. Johnson to demote. That decision is entitled to "great weight", but for the reasons set forth above in the discussion of Ms. Durant's § 1981 claim, the decision of the arbitrator is not conclusive in this Court. Furthermore there is an issue of fact as to whether the company intentionally discriminated against Mr. Johnson in denying his request to demote.

■ The company's *res judicata* defense is without merit because Mr. Johnson's individual demotion claim has been specifically exempted from any class finding.

■ The union defendants have not moved to dismiss the demotion claim, but the Court, *sua sponte*, dismisses any Title VII claim against the union for failure to file an EEOC complaint on the charge. As noted above, no EEOC charge was ever filed against any party with respect to the demotion claim.

The § 1981 demotion claim against the union defendants stands.

■ Mr. Johnson's motion for partial summary judgment on his management claim is denied. The motion, based on collateral estoppel, fails because none of the facts relating to Mr. Johnson's claim have ever been judicially determined. *See Dickerson v. United States Steel*, 472 F.Supp. 1304, at 1320 (E.D.Pa.1978). Mr. Johnson

---

7. The union defendants are not named in that charge.

8. As was the case with Ms. Durant, the EEOC complaint was in fact filed before decertification, while Mr. Johnson was still a part of the *Dickerson* class.

has made out a *prima facie* case of discrimination, *Dickerson v. United States Steel, supra,* 439 F.Supp. 55, 83 (E.D.Pa.1977), but, of course, the company must be permitted an opportunity to rebut that showing. It has not had that opportunity to this point.

## ELBERT GREEN

Plaintiff Elbert Green is an applicant for employment who was denied employment at the Fairless Hills plant. He alleges that he was denied a job on the basis of his race (black), and he has sued the company under Title VII and § 1981. Mr. Green has had an opportunity for full discovery on his claims, and the Court has carefully reviewed the record before it.

The facts underlying Mr. Green's claim were developed in his deposition, and can be set forth briefly.[9]

Mr. Green applied for a job at the Fairless Hills plant of United States Steel in April of 1973. He was told by his brother, Frederick Green, that the company had openings at the plant and that he (Elbert Green) could get a job if he applied. Mr. Green went to the company's employment office on April 11, and filled out an application. He came back to the employment office a second time to provide the company with his birth certificate and his Social Security card and was told at that time, in effect, "We'll be in touch". Mr. Green returned to the employment office a third time to find out why he had not yet been hired, and spoke to Mr. George Dobinson, a personnel officer who made hiring decisions.

When Mr. Green filled out the employment application he checked the box marked "yes" in response to the question that asked whether he had ever been convicted of a crime. He also indicated on the application that he had worked at four different bars—The Thunderbird Lounge, The Pink Squirrel Lounge, The Classroom Lounge and The Shadows Image Lounge—between 1967 and 1973. Mr. Green admitted during his third visit (and at his deposition) that the dates were false. He in fact worked at all four lounges during or after April of 1973.[10]

The application contained a certification that said, "I understand that misrepresentation or omission of facts called for on this application is cause for rejection of this application or subsequent dismissal from employment". Mr. Green understood at the time he filled out the application that the certification meant that "if there was anything on [the application] that was untrue, then the company could deny [him] an opportunity for employment, or if they later found out it was untrue it could be grounds for discharging [him]". Green Deposition at 35–6.

As noted above, on Mr. Green's third trip to the employment office he was interviewed by Mr. Dobinson. Mr. Green had gone to the office to find out why he had not been offered a job. During the interview he told the interviewer about his criminal record. The interviewer refused to give him an answer, "one way or another", why he was not offered a job. Mr. Green felt that he had been discriminated against because of his race.

When Mr. Green first went into the employment office there were about twelve people filling out applications, seven of whom were white, five of whom were black. During Mr. Green's second visit he saw seven people, all white, who had just received job offers. On his third visit, Mr. Green saw a number of people of both races.

Mr. Dobinson testified at his deposition that he rejected Mr. Green because Mr. Green made false statements on the application and during the interview; because

---

9. The Court has accepted all of the non-moving party's deposition testimony as true, as is required under Rule 56 F.R.Civ.P.

10. Mr. Green testified that he actually worked at all four bars, in chronological order, for a period commencing in April, 1973, and continuing for at least three months. Either Mr. Green's deposition testimony was incorrect, or his application (dated April 11, 1973) contained predictions of places he intended to work, and not places at which he had already worked.

Mr. Green had a "spotty" work record; and because Mr. Green had a poor attitude.

The affidavit of Lawrence N. Edwards, General Supervisor of Personnel at the Fairless Works, avers that the company's employment interviewers are instructed to take subjective factors into account in implementing the company's "best qualified" employment standard, and that intentional misstatements by an applicant will almost always result in that applicant's rejection. Furthermore, the employment application itself indicates the existence of a company policy not to hire those who falsify the application.

Any commercial enterprise must depend to a great extent on the honesty and integrity of its employees. The maxim *falsus in uno, falsus in omnibus* is as valid in business as it is in law. As a matter of law, the company has carried its burden, under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 968 (1978), and *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) of "articulating some legitimate, non-discriminatory reason" (411 U.S. at 802, 93 S.Ct. 1817) for rejection of the plaintiff.

■ As *Sweeney, supra*, makes clear, there can be no "question of fact" (for summary judgment purposes) about whether a legitimate non-discriminatory reason has been articulated; the employer need not "prove" absence of discrimination. To articulate its reason the company need only introduce evidence that a legitimate non-discriminatory reason was the basis for its action.[11] Mr. Dobinson's deposition testimony and the policy statement on the application itself satisfy the company's burden of adducing evidence to show the existence and application of the company's policy.

Nevertheless, the Court cannot conclude based simply on the seriousness of Mr. Green's falsification that United States Steel was justified in not hiring him. The Supreme Court in *McDonnell Douglas v. Green, supra*, was faced with nearly an identical issue, and flatly rejected the suggestion that seriousness of conduct *in itself* supports a refusal to employ an applicant:

"Nothing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it. . . . [B]ut the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who has engaged in unlawful, disruptive acts against it, *but only if this criterion is applied alike to members of all races.*"

411 U.S. at 804–5, 93 S.Ct. at 1825 (emphasis supplied).

The plaintiff, in other words, is virtually *always* free to show pretext. However, Rule 56 applies to the *McDonnell Douglas* three-step analysis (*prima facie* proof—non-

---

11. As the dissent in *Sweeney* notes, "[i]n litigation the only way a defendant can 'articulate' the reason for his action is by adducing evidence that explains what he has done . . ." 439 U.S. at 28, 99 S.Ct. at 297, 58 L.Ed.2d at 221. The dissent went on to argue that the employer would thereby be "proving" a fact, but the majority obviously rejected the argument. The issue is whether the employer should be required to introduce evidence of its reason, rather than articulating it simply by pleading the reason as an affirmative defense. We believe that the employer should be required to introduce at least one sworn statement (or, at trial, testimony or other evidence) to show that the stated reason was in fact applied to the plaintiff. Although Rule 11, F.R. Civ.P. requires counsel to make his or her pleading in good faith, it does not bind the employer. A sworn statement does. Compare the procedure set forth in Rule 56(e), F.R.Civ.P.

discriminatory reason—pretext) just as it does to any other federal civil litigation. The plaintiff must show an issue of fact as to whether the company's stated reason is pretextual (assuming, for purposes of argument, that the plaintiff has made out a *prima facie* case of discrimination).

The Court does not believe that any *reasonable* inference of discrimination can be drawn either from the racial mix in the employment office on three occasions, or from Mr. Dobinson's admission at his deposition that he never formed a specific intention of hiring Mr. Green. That would be true of virtually any rejected applicant. Finally, Mr. Dobinson's refusal to give Mr. Green a reason for his rejection probably does not in itself raise a reasonable inference of discrimination, but the Court need not reach a conclusion on that point.

The company has attempted to eliminate any issue of fact as to whether its reason was pretextual. The affidavit of Lawrence N. Edwards avers that it has always been the company's policy to reject applicants of all races who falsify job applications. That affidavit, however, cannot be credited entirely. If believed, the deposition testimony of Sheila Walker (a temporary interviewer in the Fairless Hills Personnel Office) shows that Mr. Edwards has made at least one remark arguably showing racial animus, and has retaliated against Ms. Walker in various ways for her filing of an EEOC complaint. The plaintiff has placed Mr. Edwards's credibility in issue, and the finder of fact must therefore hear Mr. Edwards's testimony first-hand. Because there is no other evidence that "[the] criterion [rejection of falsified applications] is applied alike to members of all races", the plaintiff is therefore entitled to "a fair opportunity to show that [the company's] stated reason for [Mr. Green's] rejection was in fact pretext." *McDonnell Douglas v. Green, supra.*

Although the plaintiff is entitled to his day in court, it is important that the issues to be litigated be carefully circumscribed. The plaintiff is represented by experienced counsel and he has been accorded a full and fair opportunity to develop and determine the material issues in dispute. Judicial economy demands that the parties be bound by the obligations imposed by Rule 56(e): "When a motion for summary judgment is made and supported as provided in this rule, an adverse party . . . must set forth specific facts showing that there is a genuine issue for trial."

Pursuant to Rule 56(d) the Court will enter an Order setting forth the following facts which the record shows not to be in dispute, as well as the following conclusions of law. For convenience, the facts will be grouped according to the normal order of proof under both Title VII and § 1981; see *Furnco Construction Co. v. Waters, supra; Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 (7th Cir. 1977):

I. Plaintiff's *prima facie* proof—

a. The plaintiff belongs to a racial minority.

b. The plaintiff applied for a job at Fairless Hills.

c. The plaintiff was rejected.

d. United States Steel has since hired whites for the positions for which the plaintiff applied.

Still in dispute are whether the plaintiff was qualified for the jobs for which he applied at Fairless Hills, whether United States Steel was hiring anyone for those jobs at the time he applied, and whether it was hiring for those jobs immediately after the plaintiff's rejection.

II. Articulation of a legitimate non-discriminatory reason for the applicant's rejection—

a. The plaintiff knowingly misstated on his employment application his employment experience for the years 1967 to 1973.

b. He knew at the time that he filled out and signed the application that such a falsification was considered by the company to be grounds for a refusal to hire him.

c. The company has adduced evidence to show a policy of refusing to hire those who falsified employment applications, and further that the misstatement was *a reason* for Mr. Dobinson's decision to reject the plaintiff. (see *McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 282 n. 10 [96 S.Ct. 2574, 49 L.Ed.2d 493] (1976)).

d. As a matter of law, a refusal to hire the plaintiff based solely on his submitting an application containing such a material misstatement is a legitimate non-discriminatory reason for his rejection, so long as that reason is not shown to be pretextual.

### III. Pretext—

Still in dispute is whether the stated reason was a pretext for racial discrimination, and, especially, whether the alleged policy of rejecting applicants for material misstatements is applied alike to all races. *McDonnell Douglas v. Green, supra*, 411 U.S. at 804–5, 93 S.Ct. 1817.

Mr. Green's Title VII and § 1981 claims against the union defendants are dismissed in their entirety. Those claims are set out in paragraph 43 of the complaint:

"43. Defendant Unions discriminated against [the plaintiff] and members of his race by their *refusal to bargain and negotiate on behalf of black people who are systematically discriminated against by defendant Company in hiring* and other terms and conditions of employment." (emphasis supplied).

Clearly, the plaintiff is not alleging that the union defendants committed any act of discrimination against him; rather he is relying on a theory of "acquiescence" in the company's discriminatory conduct, which was accepted by this Court as sufficient to state a cause of action under Title VII in *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55, 62–3 (E.D.Pa.1977). Here, as in *Dickerson* the plaintiff states a claim of " 'omission', and not 'comission'." *Id.* at 62.

There is no dispute on the record that the union has in fact bargained and negotiated on behalf of black people to achieve non-discrimination in hiring by the company. It is undisputed that the union has in every round of collective bargaining since 1962, attempted to insert a clause in the collective bargaining agreement which would both have prohibited race discrimination in hiring and permitted the union to file contractual grievances on behalf of job applicants who were discriminated against. (Declaration of Ben Fischer, especially paragraphs 5, 6, 7, 8 and exhibits noted). The company has at all times resisted those efforts, arguing that all matters related to hiring are within the sole purview of the company.

Mr. Green's claim against the union rests on the argument that the collective bargaining agreement (BLA) has in fact since at least 1971 contained provisions which would permit the union to file a grievance over discrimination in hiring, and that its failure to do so was discriminatory. To summarize that argument briefly, Mr. Green contends that Section 3 of the BLA requires the company to observe all provisions of the agreement; that Section 4(7) requires all provisions of the agreement to be applied non-discriminatorily; that Section 6E permits the union to use the grievance procedure to remedy violations of the company's obligation to the "union as such."; and that therefore the Union could have grieved management discrimination in hiring (because the hiring provisions are a "provision of the agreement"), notwithstanding that hiring is, under the agreement, within the sole purview of management.

In response to the plaintiff's argument, the union defendants have introduced evidence to show that the BLA has consistently been interpreted to exclude union grievances over hiring decisions, because hiring is under the sole control of management. Furthermore, the union's repeated attempts to obtain the right to grieve through collective bargaining is pursuasive evidence that the parties to the BLA did not believe that the union was permitted to grieve hiring practices.

The Court has reviewed the provision of the BLA in issue and believes that Section 4(7) (which protects *"employees without regard to race"*) was not intended to apply to job applicants (cf. *Allied Chemical Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 181, n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971)); nor was it intended to reach beyond the basic protections of the agreement into areas within the sole control of management. Even assuming however, that the plaintiff's reading of the BLA is plausible, mere failure on the part of the Union to read the document the same way does not create a question of fact as to whether discrimination occurred, intentional or otherwise. The union's failure to pursue the grievance must be shown to have been "arbitrary, discriminatory or in bad faith". *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *Dawkins v. Nabisco, Inc.,* 15 F.E.P. Cases 609 (N.D.Ga.1977) (Title VII). There is no evidence on this record that the union's conduct fell within any of those three criteria.

The union as a whole was making efforts in collective bargaining to remedy whatever discrimination may have been occurring. The plaintiff seeks to fasten liability for discriminatory conduct on the union defendants for a failure to pursue one (somewhat less plausible) *remedy* rather than another. The plaintiff has not pointed to any evidence of discriminatory motive, discriminatory effects resulting from union conduct, nor, especially, any nexus between union conduct and the company's decision not to hire Mr. Green.

 Title VII forbids a union "to cause or attempt to cause an employer to discriminate against an individual" because of his or her race. 42 U.S.C. § 2000e–2(c)(3). Section 1981 likewise forbids such conduct. With respect to the union, the plaintiff has merely filed a complaint and proffered a suggested reading of a legal document. For his claim to survive the union's motion for summary judgment he must point to *facts* which support an inference that the union defendants have done what § 2000e–2(c)(3) and § 1981 proscribe. There is not a scintilla of evidence on this record that the union has engaged in any discriminatory conduct with respect to hiring. Because of the plaintiff's failure to point to any such evidence, the union defendants are entitled to summary judgment on his claims.