## Maurice BELL

v.

## CITY OF PHILADELPHIA et al.

### Civ. A. No. 78–0998.

United States District Court, E. D. Pennsylvania.

March 24, 1981.

---

Irwin Lee Gross, Philadelphia, Pa., for plaintiff.

John Padova, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

GILES, District Judge.

### I. INTRODUCTION

Plaintiff, Maurice Bell, who is white, is a resident of the City of Philadelphia and brings suit against Police Officer James Gamble, who is black, Police Commissioner Joseph O'Neill and the City of Philadelphia. The action involves claims arising out of an incident which occurred on the morning of December 12, 1976, in which plaintiff was shot by defendant Gamble and was permanently paralyzed. Plaintiff asserts claims under the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the United States Constitution, as well as a pendent

state claim for assault and battery.[1] Before the court is a motion for summary judgment filed on behalf of defendants Joseph O'Neill (hereinafter "O'Neill") and the City of Philadelphia (hereinafter "City") pursuant to Fed.R.Civ.Pro. 56. The claims which are the subject of the present motion are (1) a federal claim against O'Neill based upon 42 U.S.C. § 1983, and (2) federal claims against the City based upon 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment.

Defendants object that this court lacks subject matter jurisdiction as to O'Neill and the City. In *Bell v. Hood*, 327 U.S. 678, 681–682, 66 S.Ct. 773, 775–776, 90 L.Ed. 939 (1946), the Supreme Court held that a federal district court has subject matter jurisdiction whenever the pleadings allege a controversy arising under the Constitution or laws of the United States. Here, plaintiff bases jurisdiction on 28 U.S.C. §§ 1331 and 1343, asserting deprivation of various civil rights in violation of the Constitution and in violation of two federal statutes. Accordingly, this court has subject matter jurisdiction. *See also Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974).

In support of their motion for summary judgment, defendants contend that (1) the City cannot be held liable on an implied cause of action under the Fourteenth Amendment; (2) plaintiff has failed to raise a question of material fact pertaining to any theory of defendants' liability under § 1983, and therefore defendants are entitled to summary judgment; and (3) the City cannot be held vicariously liable under § 1981 because defendant Gamble's actions did not amount to a § 1981 offense. In response, plaintiff contends there is a question of fact whether Gamble was making an arrest at the time of the shooting and was acting under color of state law. Alternatively, plaintiff submits that the facts establish that he is entitled to summary judgment on this issue.

Plaintiff urges that there is also a material factual dispute whether Gamble's conduct was a natural result of a "custom and practice" of police abuse, excessive force, and harassment on the part of the Philadelphia Police Department in violation of his constitutional rights. Allegedly such a practice was authorized or acquiesced in by the City and O'Neill thereby subjecting them to liability under § 1983. Plaintiff asserts that O'Neill is liable in his supervisory capacity as police commissioner by virtue of alleged gross negligence in executing his statutory duties to train, equip, maintain, supervise and discipline Philadelphia policemen. As to the § 1981 claim, plaintiff contends that there is sufficient evidence of racial *animus* to support a theory of *respondeat superior* against the City.

Alternatively, plaintiff submits that the undisputed facts entitle him to summary judgment on the § 1983 claim.

## II. *UNDISPUTED FACTS*

For purposes of the motion for summary judgment, defendants have agreed to the following summary of the events giving rise to this litigation, as set out in plaintiff's memorandum:

"On December 12, 1976, at approximately 3:00 to 3:30 a. m., the plaintiff, Maurice Bell, was walking down Frankford Avenue, to his home which is located on the intersection of Castor and Frankford Avenue, in the City of Philadelphia. When he arrived at the corner, diagonally across from his home, he observed a large black male, standing at what appeared to be the front steps of his porch. The plaintiff having resided in this predominantly white area of Philadelphia for a number of years was suspicious of the black male's close proximity to the plaintiff's home and family. After a short verbal exchange with the black male, who was later determined to be the defendant,

---

1. In earlier action involving this case, Judge Clifford Scott Green entered an Order on September 8, 1978, dismissing all claims of plaintiff Maurice Bell as to all defendants based upon 42 U.S.C. §§ 1985 and 1986, his pendent claims for false arrest, false imprisonment, malicious prosecution and civil conspiracy, and all claims of plaintiff Helen Schweiker. *Maurice Bell, et al. v. City of Philadelphia, et al.*, C.A. No. 78–991, E.D.Pa., September 8, 1978.

Police Officer James Gamble, plaintiff, Maurice Bell, ran into his home to check on the safety of his family."

"The plaintiff, Maurice Bell, when satisfied that all was well, went downstairs, put on his pajamas, and turned on the television. A short time later, plaintiff heard clanging outside his home and opened the door. He observed the defendant Gamble banging an object, later determined to be a nightstick, on a metal pole. Plaintiff Bell requested that defendant Gamble stop, again both began an abusive verbal exchange and defendant Gamble told the plaintiff to come out and make him stop it. Plaintiff re-entered his home, put his pants on over his pajamas and came outside; whereupon defendant Gamble had crossed the street, and again was banging on a pole. Defendant Gamble again told plaintiff Bell to come on over and make him stop. Plaintiff Bell, fearful of the defendant Gamble and knowing that a police station was across the street, and having observed an object which he thought might have been a pipe, picked up a four foot coal shovel and walked toward the defendant. The verbal exchange continued between the plaintiff and the defendant."

"Plaintiff approached the defendant and when he got within about six feet of the defendant Gamble, the defendant lunged at the plaintiff, swinging his nightstick which plaintiff Bell blocked with his shovel. Defendant Gamble then turned and ran towards the police station. Plaintiff Bell also ran towards the police station."

"The entrance to the police station has a set of double doors, a landing, five steps, another landing and another set of double doors. Defendant Gamble entered the first set of doors, ahead of the plaintiff. As plaintiff started to enter the first set of doors, plaintiff observed the defendant Gamble go through the second set of doors, it appeared to plaintiff that defendant Gamble fell, but plaintiff was not certain because of the door shutting after the defendant blocked his view. Plaintiff then opened the second set of doors, in order to go into the police station and have the defendant Gamble arrested. When plaintiff opened the second set of doors, the defendant Gamble's feet were stretched across the doorway, and plaintiff had to jump over defendant's legs. When plaintiff was turning around to confront the defendant and call for assistance, plaintiff Bell observed the defendant's holster and pistol, and was then shot twice, once in the groin and once in the stomach, the second shot severing his spinal column." Defendant Gamble admittedly never identified himself as a police officer and never asked the plaintiff to halt, stop or warn the plaintiff of his impending action."

In addition, the court must assume as true plaintiff's deposition testimony that as he jumped over Gamble's legs, he still had the shovel in his hands, and Gamble was rolling over from his side to his back; that when he came down, he did not land on Gamble, but only saw Gamble's holster as Gamble was rolling over. (Plaintiff's deposition, N.T. 65–66, 79, 80). Within seconds thereafter he recalls being shot as he was attempting to back pedal, shovel in hand, and that he was brought down by a second shot while still back pedalling. (*Id.*, N.T. 80–81).

Gamble testified at his deposition that he had run from plaintiff for his own safety after his nightstick broke; that plaintiff chased him swinging the shovel, striking him in the head as he entered the outside doors of the police station and again about the legs as he fell on the landing inside the first set of doors; that he attempted unsuccessfully to ward plaintiff off with a revolver shot; that he crawled up the steps through the second set of doors with his gun drawn; and that he fired at plaintiff twice in rapid succession as plaintiff came at him through the second set of doors out of fear for his own safety. (Gamble's deposition, N.T. 42–49).

It is then undisputed that the shooting occurred almost immediately after plaintiff came through the second set of doors as Gamble was on the floor rolling onto his

back, and as plaintiff was confronting him holding the four foot coal shovel. *Id.* at 66.

### III. *LEGAL DISCUSSION*

In applying Rule 56 of the Federal Rules of Civil Procedure[2], the Supreme Court has stated that it "[A]uthorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). *Accord, Hurtado v. U. S.*, 410 U.S. 578, 587–588 n.8, 93 S.Ct. 1157, 1163–1164 n.8, 35 L.Ed.2d 508 (1973). In line with this view, the Third Circuit has said: "The law is clear that one who moves for summary judgment has the burden of demonstrating that there is no genuine issue of fact." *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir. 1951). *Accord, Ettinger v. Johnson*, 556 F.2d 692, 696–697 (3d Cir. 1977). Unless this court can conclude as a matter of law that defendants are insulated from liability and there is no genuine issue of material fact, the motion must be denied.

#### A. *Fourteenth Amendment Claim*

Plaintiff advances the theory of an implied cause of action directly against the City under the Fourteenth Amendment. Defendants contend that no such cause of action exists. The following language of the Third Circuit in *Rogin v. Bensalem Township*, 616 F.2d 680, 686 (3d Cir. 1980) is instructive:

> There is no occasion to decide, in the present case, whether the Fourteenth Amendment authorizes a direct cause of action for damages, however, because [plaintiff] has alleged causes of action under § 1983 that are premised on [plaintiff's] constitutional claims. Indeed, § 1983 was designed to afford plaintiffs a

cause of action for constitutional violations on the part of local governmental bodies and other state officials. *Bivens* [*Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619] teaches that the existence of an effective and substantial federal statutory remedy for the plaintiffs obviates the need to imply a constitutional remedy on their behalf.

(footnotes omitted). *Accord, Mahone v. Waddle*, 564 F.2d 1018, 1024–1025 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). The Court of Appeals said that it would be a redundant and wasteful use of judicial resources to permit the adjudication of both constitutional and § 1983 claims where the latter wholly subsume the former. *Rogin v. Bensalem*, 616 F.2d 686–687.

In the instant case, plaintiff claims that state officials acting under color of state law have deprived him of constitutional rights. Section 1983 affords plaintiff remedies at law or equity against the named defendants for any constitutional violations that can be established. *Id.* Thus, in this case, plaintiff's § 1983 claims subsume those under the Fourteenth Amendment. Accordingly, the court need not reach the constitutional issue of whether in these circumstances a direct cause of action arises under the Fourteenth Amendment. *Cf. Rogin, supra*, 616 F.2d at 687, n.27. (Court of Appeals refused to express an opinion on whether a direct cause of action would lie under the Fourteenth Amendment if no *effective* federal statutory remedy existed). Here, plaintiff has an effective federal statutory remedy which subsumes his constitutional claims. *Id.; Mahone v. Waddle, supra*, 564 F.2d 1024–1025. Accordingly, defendants are entitled to summary judgment on the claim that plaintiff has a direct cause of action under the Fourteenth Amendment.

---

2. Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part:

> (c) ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law
. . . .

## B. *Section 1983 Claims*

In support of their motion for summary judgment, defendants O'Neill and the City argue that, Gamble's actions were not under "color of state law" and, therefore, no liability may attach to either of them. They submit that § 1983 liability may not be predicated on a theory of *respondeat superior*. However, plaintiff argued that under § 1983 O'Neill is directly liable, in his supervisory capacity, for the proximate cause of plaintiff's injuries, and that both O'Neill and the City are directly liable by virtue of authorization, approval or acquiescence in a matter of police misconduct, under the custom or practice standard discussed in *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### 1. *Respondeat Superior*

■ The parties have exhaustively briefed the question of whether defendant, Gamble, acted under color of law. For the reasons which follow, the court concludes that liability under a *respondeat superior* theory does not exist either as to the City or the defendant, O'Neill. Hence, for purposes of this portion of defendants' motion, the court need not resolve the issue of whether Gamble was acting under color of state law.

There can be no vicarious municipal liability under *Monell*. The Supreme Court specifically foreclosed that avenue of relief: "We conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Thus, even if Gamble were acting under color of law, the City could not be held liable for his acts. Accordingly, the City is entitled to summary judgment on the *respondeat superior* claim arising under § 1983.

Similarly, regarding supervisory personnel, the Third Circuit has recently held that a theory of liability based on *respondeat superior* is not available under § 1983. *De Tore v. Local # 245*, 615 F.2d 980, 983 (3d Cir. 1980). *Accord, Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). In *De Tore*, dismissal of the complaint of a CETA worker who claimed she was unlawfully discharged because she was a transsexual was upheld. *Id.* at 982–983. The Third Circuit held that the Secretary of Labor was not liable under a *respondeat superior* theory because the evidence demonstrated that local officials were responsible for operation of CETA programs, the Secretary of Labor did not know of plaintiff's discharge until the time of the suit three years later, and the federal government did not thoroughly supervise day to day local CETA operations. Because *respondeat superior* liability does not exist for supervisory personnel under § 1983, defendant, O'Neill is entitled to summary judgment on this aspect of plaintiff's complaint.

### 2. *Direct Supervisory Liability*

Plaintiff alleges that defendant, O'Neill, was responsible for training Gamble and for his conduct, that O'Neill failed adequately to train, supervise or discipline Gamble, and that O'Neill knowingly failed to enforce the applicable laws and Philadelphia Police Department regulations on the use of deadly force. Plaintiff contends that O'Neill's actions directly caused plaintiff's injuries and deprived plaintiff of his civil rights under 42 U.S.C. §§ 1981 and 1983. (Complaint, ¶¶ 9, 20–21, 25–26). Plaintiff's claim is essentially one of negligence, i. e., that the proximate cause of his injuries was defendant, O'Neill's failure to properly supervise, train and discipline police officer Gamble. Under § 1983 liability of supervisory personnel for negligence depends upon causation. *See e. g., Monell v. New York City Department of Social Services*, 436 U.S. 658, 690–695, 98 S.Ct. 2018, 2035–2038, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). For plaintiff to prevail on his § 1983 claim, he must prove that defendant, acting under color of state law, (proximately) caused a deprivation of a federally secured right. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 145, 150, 90 S.Ct. 1598,

1604, 26 L.Ed.2d 142 (1970).[3] However, in this case, even if O'Neill were acting under color of state law, plaintiff's claims would fail.

In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court circumscribed the parameters of direct supervisory liability under § 1983. *Rizzo* was a class action against city officials, including the police commissioner in his supervisory capacity, alleging a pervasive pattern of illegal and unconstitutional police abuse of Philadelphia citizens especially members of racial minority groups. The court held that mere inaction on the part of supervisory officials would not suffice to support a § 1983 claim, absent an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." *Id.* at 371, 96 S.Ct. at 604.

The court in *Santiago v. City of Philadelphia*, 435 F.Supp. 136 (E.D.Pa.1977) stated:

"A careful reading of the [Rizzo] opinion reveals that the defendants could not be held liable for constitutional violations caused by subordinate policemen because the court concluded that no action by defendants, be it intentional or negligent was linked causally to any constitutional deprivation. The lack of causation rather than culpable conduct was the deficiency in that suit."

*Santiago* at 151. We agree with this reading of *Rizzo*, and believe that plaintiff in this case has similarly failed to show such a causal connection.

[I]nvocation of the word 'pattern' in a case where, unlike *Hague* [*Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423] and *Medrano* [*Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566] the defendants are not causally linked to it, is but a distant echo of the findings in those cases. The focus in *Hague* and *Medrano* was not simply on the number of violations which occurred but on the common thread running through them: a 'pervasive pattern of intimidation' flowing from a deliberate plan . . .

*Rizzo v. Goode*, 423 U.S. at 375, 96 S.Ct. at 606.[4]

Plaintiff has attempted to transform O'Neill's alleged inadequate supervision into supervisory liability. However, he has failed to adduce any probative evidence showing a causal link between the act of Officer Gamble firing at plaintiff and an alleged pattern of police abuse condoned by the Commissioner. Allegations of police abuse are inapposite here. Plaintiff admits that defendant, Officer Gamble, turned from plaintiff and ran from the street into the precinct once his nightstick was broken. The officer did not react by immediately drawing his police revolver. It was plaintiff who came after Gamble, jumped over him while he was lying on the floor of the precinct hallway and it was plaintiff who,

---

**3.** "The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted 'under color of law.' " *Id.* (footnote omitted).

**4.** In reference to these two cases, the Court had stated:

In *Hague v. CIO*, 307 U.S. 496 [59 S.Ct. 954, 83 L.Ed. 1423] (1939), the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption

and enforcement of deliberate policies by the defendants there (including the Mayor and the Chief of Police) of excluding and removing the plaintiff's labor organizers and forbidding peaceful communication of their views to the citizens of Jersey City. These policies were implemented 'by force and violence' on the part of individual policemen. . . .

Likewise, in *Allee v. Medrano*, 416 U.S. 802 [94 S.Ct. 2191, 40 L.Ed.2d 566] (1974) . . . we noted: "The complaint charged that the enjoined conduct was but one part of a *single plan* by the defendants, and the District Court found a *pervasive pattern of intimidation* in which the law enforcement authorities sought to suppress appellees' constitutional rights."

*Rizzo v. Goode*, 436 U.S. at 374, 96 S.Ct. at 606.

still armed with the shovel, turned to confront Gamble. These facts dispel the notion that Gamble's conduct exemplified wanton, callous aggression.

Plaintiff admits that it was only after he saw Officer Gamble lying on his back with a gun and holster, that he, plaintiff, who was standing over Gamble with a large coal shovel, began to back pedal. Plaintiff produced no evidence that Gamble had ever been disciplined for use of excessive or deadly force.[5] *Cf. Popow v. City of Margate,* 476 F.Supp. 1237 (D.N.J.1979) (Police chief knew that officer had been involved in two prior shooting incidents; one incident encompassed culpable conduct on the officer's part).[6]

Plaintiff has similarly failed to show that defendant, O'Neill, knew or should have known that officers, like Gamble, were hostile towards plaintiff, and that O'Neill encouraged that hostility. *Cf. Turpin v. Mailet,* 579 F.2d 152 (2d Cir. 1978), *vacated* 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 *modified,* 591 F.2d 426 (2d Cir. 1979) (Board of Police Commissioners rewarded policeman, found liable for use of excessive force, with a promotion).[7]

Plaintiff has shown only that Officer Gamble used deadly force when confronted with an armed man who chased him into a police station. On the other hand, plaintiff has *failed* to show a causal nexus between his injuries and O'Neill's alleged negligence. There is no evidence whatsoever that Gamble was actually trained to use excessive force or that under these circumstances, as to the undisputed facts, he was psychologically predisposed to use excessive force solely or substantially because he believed it would be approved or ratified by O'Neill. Therefore, O'Neill is entitled to summary judgment on this claim.

### 3. *The Monell Theory*

The crucial language of *Monell* is as follows:

> Local governing bodies therefore, can be sued directly under § 1983 ... where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person" by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels....
>
> On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort....
>
> ... The italicized language plainly imposes liability on a government that, under color of some official policy, "causes an employee to violate another's constitutional rights .... Congress did not intend § 1983 liability to attach where such causation was absent.

*Id.* 436 U.S. at 690–692, 98 S.Ct. at 2035–2036 (footnotes omitted).

Under *Monell,* both municipalities and supervisory officials acting in their official capacity may be found liable under § 1983 where official policy or custom, or official

---

5. The record evidence shows that at the time of the alleged shooting, defendant had been a police officer for more than six years, and had been reprimanded only twice: once for sleeping on the job, and once for being in an automobile accident. Gamble testified that he had used his gun in the line of duty only at the firing range and had never shot at anybody. (Gamble's deposition, N.T. 15–16).

6. *See* further discussion of *Popow* at p. 1164, *infra.*

7. *And see* discussion of *Turpin* at p. 1164, *infra.*

conduct demonstrating authorization, approval or acquiescence result in constitutional violations.

Courts have considered what constitutes a "pattern" or "policy" of abuse actionable under *Monell.*

In *Popow v. City of Margate,* 476 F.Supp. 1237 (D.N.J.1979), the court held that gross negligence or recklessness on the part of a municipality and/or its supervisory officials in training, supervising and disciplining its police officers could be a basis for § 1983 liability under *Monell.* The court stated that the training must be so inadequate as to make the alleged misconduct almost inevitable. The court added that "persistent failure to discipline or control subordinates in the face of knowledge of their propensity for improper use of force may constitute an official custom or *de facto* policy actionable under § 1983." *Id.* at 1246–1247. In *Popow,* however, the police chief was aware that the officer in question had on two prior occasions been involved in shooting incidents, and at least one involved circumstances of culpable conduct. *Id.* In the instant case, there is no evidence that Gamble ever used excessive force that was met with official acquiescence. There is no evidence that O'Neill was aware of any tendencies on the part of Gamble to commit abusive and wanton acts of violence. Taking the evidence in the light most favorable to plaintiff, the evidence fails to show that prior to the shooting O'Neill should have been aware that Gamble was unfit to be a police officer.

In *Turpin v. Mailet,* 579 F.2d 152 (2d Cir. 1978), *vacated,* 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 *modified,* 591 F.2d 426 (2d Cir. 1979), plaintiff had been subjected to the use of excessive force by a police officer. He brought a civil action against the officer based on the incident and was awarded damages. Even though the incident and suit were well-publicized, the Board of Inquiry decided against disciplinary action. Instead the officer was promoted. Three months after the conclusion of plaintiff's civil case, another officer maliciously arrested plaintiff without a legal basis. The trial court dismissed plaintiff's Fourteenth Amendment and pendent state claims against the city. The Second Circuit Court of Appeals (sitting *en banc*) held that plaintiff stated a claim upon which relief could be granted and remanded:

"... Turpin alleges that the Board of Police Commissioners, aware that the growing animus towards Turpin presented a threat to his liberties, acted in such a way as to encourage the expression of these feelings of hostility against him. Not only did the department fail to take any disciplinary action against Skeens, it rewarded him with a promotion ... Where the actions of subordinate employees are concerned, the failure of supervisors to control their behavior may, in effect, create a *de facto* departmental policy ..."

579 F.2d at 167–168.

In this case, no evidence exists that O'Neill knew of or encouraged police *animus* towards the civil rights of plaintiff which proximately caused his injuries. The facts in *Wilkinson v. Ellis,* 484 F.Supp. 1072 (E.D.Pa.1980) present a situation similar to that in *Turpin, supra. Wilkinson* involved an ongoing deprivation of the civil rights of the same individual met with official inaction which caused subordinates to think that they could continue to violate the individual's constitutional rights with impunity. *See also Kedra v. City of Philadelphia,* 454 F.Supp. 652, 674–676 (E.D.Pa.1978).

The existence of general policies and practices within an organization or department can create constructive knowledge of alleged constitutional violations by a subordinate. *Santiago v. City of Philadelphia,* 435 F.Supp. 136 (E.D.Pa.1977). In *Santiago,* the court stated that the following considerations were relevant:

... the knowledge a defendant-supervisor has, or should have, of the conduct of subordinates; the degree of authority and control the supervisor has over the conduct of subordinates; the existence *vel non* of policies or practices within the supervisor's governmental department which relate to the offending conduct;

and the extent to which the supervisor has encouraged or acquiesced in these practices and/or subordinates' misconduct.

*Id.* at 151.

The constructive knowledge must relate to the situation under consideration. Plaintiff must show that he has been the victim of a pattern of unconstitutional conduct, whether tacitly or officially approved or encouraged. Alternatively, he must show that the police officer has been guilty of prior incidents of misbehavior which should put his superiors on notice that he may not be fit for his position.

The view of the court in *Smith v. Ambrogio*, 456 F.Supp. 1130 (D.Conn.1978) lends support to this analysis.

"The ascertainment of an unarticulated policy of a town is similar to the inquiry concerning the liability of supervisory officials accused of responsibility for unconstitutional conduct taken by subordinates . . . the liability of the supervisor or the town depends on whether they have commanded the result or adopted a policy, a natural consequence of which is the denial of constitutional right."

*Id.* at 1135.

In *Smith*, the court cautioned against placing an entire police department on trial each time a claim is made that a policy of police abuse exists. *Id.* at 1137. Likewise, this court will not hold that simply because some police officers may have been irresponsible in using excessive force that the natural consequence of that is that every other police officer who uses force will use excessive force or seek to do so with impunity.

■ In *this* case, assuming Gamble used excessive force under the undisputed facts, the City and police commissioner are not liable unless plaintiff can demonstrate a causal *nexus* linking an official policy or custom and the alleged constitutional tort. *Monell v. New York City Dept. of Social*

*Services*, 436 U.S. at 690–692, 98 S.Ct. at 2035–2037. Accordingly, we believe that a theory of municipal and official liability, based on a "pattern or custom" of abuse must be limited to situations where the *nexus* between the incident in question and the alleged policy is clear.[8]

In the instant case, plaintiff has shown no causal relationship. In contrast, the municipal defendants by deposition testimony have shown that Gamble had no prior history of fire arms abuse or citizen abuse.

Plaintiff has proffered in opposition to the motions for summary judgment unverified reports from the Philadelphia Police Project Study ("PILCOP") and a staff report of the U. S. Civil Rights Commission. According to plaintiff these reports, if they could be treated as affidavits, show that the City and the Police Commissioner:

"have sanctioned and allowed Philadelphia Police officers to engage in indiscriminate arrests of citizens; to use excessive and unwarranted force including deadly force; to engage in a systemic abuse of investigative procedures regarding police accountability, including harassment, intimidation and non-objective interviewing; and to use cover criminal charges against complainants to protect police officers from counter complaints; both civil or criminal."

(Plaintiff's Memorandum, p. 12).

However, there exists no connection between these studies and the incident involving Bell and Gamble. Assuming there was an arrest situation, the "arrest" could hardly be described as indiscriminate. This is a situation where a police officer after either attempting to defend himself from an aggravated assault by plaintiff or after attempting to strike plaintiff, withdrew from the fray and ran away. If first an aggressor, he withdrew from that status when he fled from plaintiff. Although there was subsequent violence it occurred when under the undisputed facts plaintiff arguably had become the aggressor. The matter resolves

---

**8.** Supervisory personnel's control may establish acquiescence in a "pattern or practice" of misconduct, and thus lead to liability. However, statistical probability does not necessarily establish acquiescence in such misconduct. *Rizzo v. Goode, supra.*

itself to whether under circumstances where the plaintiff is arguably the aggressor, the response of the police officer was excessive. Nothing in the proffered materials helps plaintiff on the question of excessive force where the police officer beyond question responds not as the aggressor but as the pursued. Even the staff report of the U. S. Commission on Civil Rights acknowledges at page 84 the statement of the Seventh Circuit in upholding a dismissal of a § 1983 case. "[H]ere there is no indication that the City of police department officials could have instituted any plan or training program which would have made its officers more willing to tackle a belligerent, irrational, ex-Golden Gloves boxer like James O'Malley." *Jamison v. McCurrie*, 565 F.2d 483, 486 (7th Cir. 1978).

Likewise here, plaintiff has not come forward with any evidence to show that the City or O'Neill could have, as a practical matter, devised any training program which would have made a significant difference in predictably restraining a police officer who had to make a split second decision whether under the undisputed facts here to use deadly force for his own protection.

Even assuming that there existed a practice, policy or custom of official condonation of excessive force, there exists no factual showing that such condonation was causally linked to the shooting of plaintiff. In *Monell*, the Supreme Court stated that such causation is necessary. 436 U.S. 658 at 692, 98 S.Ct. 2018 at 2036, 56 L.Ed.2d 611. In this case, *Monell* is not implicated because plaintiff has failed to offer proof that this officer was disposed to use excessive force or that the City has encouraged or ratified unconstitutional acts against plaintiff. *See Turpin, supra; Popow, supra.* Such proof is absent and is required under Rule 56 Fed.R. Civ.Pro. to rebut Gamble's history of no firearm or citizen abuse and to show causation, the link *Monell* requires.

There was an investigation following the shooting. However, based on a review of the record, it can hardly be characterized as intimidating or harassing of plaintiff as it was pursuant to a complaint by plaintiff against Gamble. It is true that Gamble did file criminal assault charges against plaintiff in state court and plaintiff was acquitted. From Gamble's version of the incident, the charges would appear to have had a reasonable basis. Gamble testified that he had been struck by the coal shovel prior to shooting in self-defense. (Deposition testimony of Officer James Gamble, Tr. 42–46, 57, (filed Feb. 11, 1980)). Further evidence of probable cause is plaintiff's admission that he picked up the coal shovel and crossed the street to confront defendant. Plaintiff did not go directly to the police station which plaintiff knew was across the street from his home, nor did he attempt to telephone the police even though he believed defendant to have been armed with a pipe. On these facts, the PILCOP report sheds no light whatsoever upon Gamble's motivation for using his police revolver at the time of the shooting.

Accordingly, defendants are entitled to summary judgment on plaintiff's *Monell* claim.

### The § 1981 Claim

Plaintiff claims the city is liable under 42 U.S.C. § 1981 [9] for acts of its policemen who, acting under color of state law and motivated by racial *animus*, injure other citizens. In *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), *cert. denied* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978) the Third Circuit held that a cause of action against a municipality existed where black citizens alleged that city police, acting under color of state law and with racial *animus*, assaulted, arrested, imprisoned, and prosecuted them. *Id.* at 1024 n.7A. The *Mahone* court stated that § 1981 would make the city liable for the official miscon-

---

**9.** 42 U.S.C. § 1981 reads as follows:

§ 1981. Equal rights under the law. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

duct of its police but not for their private acts of violence. *Id.* at 1031. *Accord, Milburn v. Girard*, 441 F.Supp. 184, 187–190 (E.D.Pa.1977). Plaintiff argues that Officer Gamble was acting under color of state law, and, motivated by racial *animus*, physically injured plaintiff. At this point, the court cannot resolve this issue. The Third Circuit has stated repeatedly that civil rights claims must be pleaded with factual bases and specificity. *Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3d Cir. 1976); *Kauffman v. Moss*, 420 F.2d 1270 (3d Cir. 1970), *cert. denied* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *Negrich v. Hohn*, 379 F.2d 213 (3d Cir. 1967). *And see Hall v. Penna. State Police*, 570 F.2d 86, 89 (3d Cir. 1978). Plaintiff's complaint is totally lacking in specificity and plaintiff has not filed a proper motion to amend.[10] Accordingly, the court shall dismiss plaintiff's § 1981 claim without prejudice subject to his filing a more specific pleading within fifteen (15) days from the date of this order. Failure to do so may result in dismissal of the § 1981 claim.

---

**10.** While it may be possible for a plaintiff to plead facts sufficient to make out a § 1981 claim under certain circumstances, such facts must demonstrate a racially discriminatory purpose, intent or motive. *See Resident Advisory Board v. Rizzo*, 564 F.2d 126, 140–145 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499. *Croker v. The Boeing Co.*, 437 F.Supp. 1138, 1181 (E.D.Pa.1977); *Green v. U. S. Steel Corp.*, 481 F.Supp. 295, 306 (E.D.Pa.1979); *Milburn v. Girard, supra*, 441 F.Supp. at 188.